IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **AMBULATORY SERVICES OF PUERTO RICO, LLC,** | |
| **Plaintiff,** | **Civil Action No.** |
| **v.** | |
| **SANKAR NEPHROLOGY GROUP, LLC,** | |
| **Defendant.** | |

## COMPLAINT

Plaintiff Ambulatory Services of Puerto Rico, LLC ("**ASPR**") brings this action against Defendant Sankar Nephrology Group, LLC ("**SNG**"), and alleges as follows:

## INTRODUCTION

1.      This is an action for damages and declaratory relief arising from SNG's breaches of contract and wrongful acts that deprived ASPR of business assets in a joint venture in Naranjito, Puerto Rico.

2.      In 2014, ASPR and SNG created SNG Naranjito, L.L.C. ("**Naranjito**"), a Puerto Rico company, for the purpose of operating a hemodialysis facility in Puerto Rico known as Centro de Dialisis San Miguel Arcangel (the "**Clinic**").  SNG purchased 60% of the Clinic's business assets and ASPR acquired the remaining 40%.

3.      SNG and ASPR agreed that the Clinic's business assets would be unencumbered and not subject to the prior or personal obligations the parties.  Unbeknownst to ASPR, SNG contrived a deceitful "Buy-In Scheme" (as further explained in paragraph 24) to deprive ASPR of its investment in Naranjito.  SNG's Buy-In Scheme involved surreptitiously obtaining a $3.7

Million loan secured by the very assets that it had purchased and arranging for Naranjito to pay for the loan.  SNG hid the loan and lien from ASPR for over two (2) years.  ASPR first learned of the Buy-In Scheme in late 2016 when the parties' sold the business assets.  Instead of SNG taking full responsibility for the debt, SNG continues to deprive ASPR of its investment.

4.      As further explained herein, SNG's bad faith acts and material breaches of contract have caused (and continue to cause) substantial harm to ASPR, which has yet to realize a cent from the sale.

## PARTIES

5.      ASPR is a limited liability company organized under the laws of the Commonwealth of Puerto Rico with its principle place of business in San Juan, Puerto Rico. ASPR's sole member, Carlos R. Rivera ("**Rivera**"), is a US citizen and resident of Puerto Rico.

6.      SNG is a limited liability company organized under the laws of the Texas with its principle place of business in Fort Worth, Texas.  Upon information and belief, SNG's members as well as its ultimate owners, Ponniah Sankarapandian aka Ponniah Sankar ("**Sankar**") and Balamurugan Sankarapandian aka Bala Sankar, are citizens and residents of Texas.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

10.      This Court has personal jurisdiction over SNG as a Texas limited liability company regularly transacting business in the district, and with its principle place of business in Fort Worth, Texas.  Additionally, SNG's wrongful acts and breaches of contract were committed in Fort Worth, Texas.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because all of the defendants reside in the district, and (b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this district.  Also, venue is proper pursuant to Section 5(e) of the parties' Membership Contribution Agreement.

## FACTUAL ALLEGATIONS

12.     Rivera commenced operating the Clinic on May 3, 2012, in Naranjito, Puerto Rico through his company, Centro de Dialisis San Miguel Arcangel, LLC ("**San Miguel**"). Exclusively through Rivera's efforts, San Miguel obtained all necessary authorizations from the Puerto Rico Department of Health and the Centers for Medicare & Medicaid Services to operate the Clinic, including securing the highly sought-after Certificate of Need ("**CON**").[1]  Rivera also negotiated all health insurance provider contracts, hired staff and fully equipped the Clinic.

13.     San Miguel successfully operated the Clinic, building rapport with its patient base and establishing itself as a premier hemodialysis facility in Puerto Rico.

### Joint Venture with SNG

14.     Due to its success, in 2013 Rivera sought to duplicate his clinic model in the city of San Juan.  To do so, Rivera sought an investor to provide fresh capital for the development of a future facility.  His inquiries led him to SNG, which owned and operated dialysis clinics in Texas.

15.     SNG expressed an interest in investing in a new San Juan clinic.  However, having learned of the Clinic's success, SNG preferred instead to acquire an interest in the

---

[1] The CON is a state-issued certification required to open and operate a healthcare facility in Puerto Rico.  The CON is only issued after completion of a comprehensive regulatory process that evaluates the actual need of a particular healthcare facility, including a hemodialysis facility, in a particular geographic area.  Thus, CON's are granted on a limited basis by the Puerto Rico Department of Health and are a valuable asset to the holder.

existing business.  Consequently, in 2014 Rivera negotiated a partial sale of the Clinic's assets

with Sankar and other SNG representatives as part of a joint venture in Naranjito.

16.     The parties agreed that the business assets contributed to Naranjito would remain

unencumbered and free of any personal liens or obligations.

17.     On July 1, 2014, SNG, San Miguel, and Rivera executed a Pre-Purchase

Agreement memorializing the parties' agreement and providing for certain deliverables and other

conditions for closing.

18.     On August 1, 2014, SNG, San Miguel and Rivera executed an Asset Purchase

Agreement whereby Rivera, through San Miguel, sold 60% of the Clinics business assets for the

sum of $3,720,000.  Pursuant to the parties' agreement, SNG agreed to pay Rivera the $3.72

Million with funds that were independent and separate from the business assets of the Clinic.

Rivera retained the remaining 40% interest in San Miguel which he subsequently transferred to

ASPR.

19.     Also on August 1, 2014, ASPR and SNG executed a Membership Contribution

Agreement ("**MCA**") and contributed their respective undivided interests in the Clinic's business

assets ("**Contributed Assets**") to Naranjito.[2]

20.     Pursuant to the MCA, the parties agreed that the Contributed Assets must remain

unencumbered of liabilities or obligations personal to either SNG or ASPR and unrelated to the

business of the Clinic.  Specifically, Section 2 of the MCA provides:

> Notwithstanding any provision of this Agreement to the contrary, [Naranjito] is **not assuming in conjunction herewith any other liabilities and obligations, including, without limitation, all liabilities and obligations associated with any activities conducted by the Members** [ASPR and SNG], jointly or

---

[2] A true and correct copy of the MCA is attached hereto as Exhibit "A."

4

severally, other than with respect to the Contributed Assets and their use for [Naranjito's] purposes.

(emphasis added).

21.     Also on August 1, 2014, SNG and ASPR executed a Limited Liability Operating Agreement for Naranjito ("**Operating Agreement**") governing the operations of the business.

22.     Thereafter, Naranjito commenced operations with SNG serving as the majority member and in control of the operations and finances of the Clinic.

### SNG's "Buy-In Scheme" to Encumber All Contributed Assets

23.     Unbeknownst to ASPR and Rivera, and prior to the execution of the MCA, SNG crafted a deceitful scheme (the "Buy-In Scheme") where it surreptitiously borrowered against the Contributed Assets to buy into the joint venture and arranged for Naranjito and ASPR to become liable for the repayment of the loan.   Specifically, SNG executed the Buy-In Scheme in three steps:

(a)     Obtaining a loan from BB&T, without the knowledge or consent of ASPR, and using the proceeds of the loan to pay for the 60% interest in Naranjito;

(b)     Securing the loan with ASPR's assets and using the loan proceeds to buy-in; and

(c)     Using profits from Naranjito to pay down the loan.

24.     To effectuate the Buy-In Scheme, SNG negotiated a secured loan with Branch Banking and Trust Company ("**BB&T**").   Specifically, on August 5, 2014, Sankar, through SNG and Naranjito, executed a Promissory Note in favor of BB&T in the principal amount of $3,700,000 (the "**BB&T Loan**").   SNG also executed a Security Agreement purportedly granting

a lien[3] in favor BB&T in Naranjito's personal property, including the Contributed Assets.[4]

25.    Importantly, SNG pledged ASPR's 40% interest without authorization subjecting it to BB&T's lien.

26.    In furtherance of the Buy-In Scheme, upon information and belief, SNG coordinated a closing date with BB&T for August 5, 2014[5] in order to have sufficient time to enter into the MCA and be in a position to represent to BB&T its authority to execute the Loan Documents.  With the BB&T Loan proceeds, SNG bought into Naranjito.

27.    At no point while entering into the MCA or thereafter did SNG disclose to ASPR the BB&T Loan or produce the Loan Documents.[6]

28.    Going forward, ASPR unknowingly paid down the BB&T Loan through Naranjito and became indirectly responsible to BB&T.  SNG, therefore, acquired its interest having invested no capital of its own.[7]

---

[3] On August 14, 2014, BB&T filed with the Department of State of Puerto Rico a UCC-1PR Financing Statement ("**UCC-1**") regarding its alleged lien on the personal property of Naranjito.

[4] The Promissory Note, Security Agreement and UCC-1 are collectively referred to as the "**Loan Documents**."

[5] San Miguel did not receive payment from SNG for the purchased 60% interest until August 5, 2014.  The Loan Documents also are dated August 5, 2014.

[6] Upon information and belief, SNG never disclosed the existence of the BB&T Loan in the books of Naranjito and always claimed as equity its full 60% capital contribution.

[7] ASPR later learned that SNG secreted from other business partners other loans and liens on assets similarly contributed in other joint ventures.  Taken as a whole, SNG's Buy-In Scheme is akin to a Ponzi scheme whereby SNG funds its operations through loans secured by its partner's contributed assets without their knowledge, and constantly needs additional loans to fund the payments of its prior loans and acquisitions – and before SNG's partners catch wind of the scheme.

**Inadequate Clinic Operations and Subsequent Sale to Bio-Medical**

29.     The Clinic's operations from August 2014 to 2016 under the management and control of SNG were plagued with financial and managerial deficiencies.

30.     Although Rivera remained a Clinic administrator, SNG contracted its affiliate, Renal Physicians of North Texas, LC ("**Renal Physicians**"), to operate the day-to-day operations and financial affairs of the Clinic.  Renal Physicians' deficiencies included, among others, failing to properly manage the staff, verify patient eligibility for insurance coverage, timely and accurately submit claims to the insurance carriers and diligently follow up on denied claims and collections.

31.     ASPR also found significant errors and omissions in the accounting and billing reports raising significant concerns as to the Clinic's future financial viability.

32.     By the end of 2015, Rivera, began courting potential buyers of the Clinic in an effort to maximize the return on its investment and benefit from the remaining good will and success of the Clinic.

33.     After engaging in negotiations with various potential buyers, Rivera secured a $7,000,000 offer ("**Sales Offer**") from Bio-Medical Applications of Puerto Rico, Inc. ("**Bio-Medical**").

34.     On February 9, 2016, SNG and ASPR executed an Agreement to Sell Assets of SNG Naranjito, LLC to Fresenius Medical Care[8] ("**Member Sale Agreement**") setting forth the

---

[8] Bio-Medical belongs to a group operating under name Fresenius Medical Care.

members agreement to approve the Sales Offer.[9]  Importantly, the members agreed that the sale

proceeds would be allocated pursuant to each members ownership interest, specifically:[10]

| Members | % Ownership | Proceeds |
| --- | --- | --- |
| Sankar Nephrology Group, LLC | 60% | $ 4,200,000.00 |
| Ambulatory Services of Puerto Rico, LLC | 40% | $ 2,800,000.00 |
| Renalium, LLC | 0% | Any proceeds in excess of $ 7,000,000.00 |

35.     On August 22, 2016, Naranjito and Bio-Medical executed an Asset Purchase

Agreement ("**Bio-Medical APA**") agreeing to the purchase and sale of substantially all of

Naranjito's assets.

### Discovery of the BB&T Loan and SNG's Buy-In Scheme

36.     Again, SNG did not disclose the BB&T Loan and lien to ASPR despite agreeing

to the sale of the encumbered business assets.

37.     Not until November 2016 did ASPR discover the lien as Bio-Medical conducted

its due diligence in connection with the Bio-Medical APA.  Upon further inquiry by Bio-

Medical, on or about November 17, 2016, BB&T confirmed in a payoff letter ("**BB&T Payoff**

**Letter**") the existence of the BB&T Loan with a then-existing balance of $2,778,788.40, and the

lien against Naranjito's personal property including the Contributed Assets.

---

[9] A true and correct copy of the Member Sale Agreement is attached hereto as <u>Exhibit "B."</u>

[10] Renalium, LLC is an entity owned by Rivera which initially owned the business assets prior to San Miguel commencing operations.

38.   Incredibly, SNG did not disclose the BB&T Payoff Letter to ASPR either. Instead, it was not until Bio-Medical produced the BB&T Payoff Letter to ASPR that it first learned of the BB&T Loan and discovered SNG's Buy-In Scheme.

39.   ASPR immediately began making demands on SNG, Bio-Medical and BB&T that it was entitled to receive 40% of the sale proceeds, and at no point had ASPR authorized the BB&T Loan and lien on the Contributed Assets.

40.   On several occasions, including November 17, 2016 and December 22, 2016, ASPR provided wire instructions to SNG and Bio-Medical in order to receive its $2.8 Million share of the sale proceeds.  Such requests were ignored.

41.   For its part, SNG continued to deceive and harm ASPR.  SNG began a campaign to convince Bio-Medical that the BB&T Loan and lien were authorized and, as such, the sale proceeds had to be paid to BB&T in order to satisfy the BB&T Loan that encumbered the business assets.

42.   Apparently frustrated with ASPR's and Rivera's repeated demands for SNG's compliance with its prior agreements, on December 7, 2016, SNG filed suit against ASPR and Rivera in the Court of First Instance of the Judicial Center of Bayamon, Puerto Rico[11] based on unfounded allegations of breaches of fiduciary duty, violations of Puerto Rico corporate laws and for unjust enrichment purportedly arising from Naranjito's Operating Agreement.[12]

------

[11]   See Court of First Instance, Bayamon, Puerto Rico, Case No. DAC2016-2126.  This lawsuit was SNG's second foray into the legal system in Puerto Rico.  On September 8, 2016 in a separately filed action, SNG attempted to ouster Rivera after his repeated inquiries into the deficient operation of the Clinic and unanswered demands for financial information.  See Court of First Instance, Bayamon, Puerto Rico, Case No. DPE2016-0624.

[12]   On December 22, 2016, SNG voluntarily dismissed its lawsuit and, on December 28, 2016, filed a Demand for Arbitration before the American Health Lawyer's Association Dispute

43.     Undeterred by SNG's underhanded and bad faith attempts to dissuade ASPR from demanding its agreed upon share of the sale proceeds, ASPR pressed forward with its demands to SNG, Bio-Medical and BB&T.

44.     However, on December 31, 2016, Bio-Medical and Naranjito closed on the sale.

45.     Despite ASPR's best efforts to have its portion of the proceeds wired directly to ASPR, on January 3, 2017, Bio-Medical processed two wire transfers totaling $7 Million to two (2) separate accounts at BB&T, as follows:

    a.  $2,719,638.20 to an account in the name of SNG and Naranjito; and

    b.  $4,280,361.80 to an account in the name of Naranjito.

46.     Upon information and belief, the first transfer of approximately $2.72 Million satisfied the BB&T Loan.  As for the remaining $4.28 Million, upon information and belief, such funds remain in Naranjito's BB&T account, but under SNG's control.  To date, neither SNG nor BB&T has provided to ASPR a statement confirming the allocation of the sale proceeds.

47.     As of this filing, ASPR has not realized any monies from the sale of its interest in the business assets to Bio-Medical.

## COUNT I
## BREACH OF CONTRACT - MCA

48.     ASPR re-alleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

49.     The MCA is a valid and binding contract between ASPR and SNG.

_____

Resolution Service raising similar claims as those brought in the Puerto Rico lawsuit.  Currently, a Second Amended Demand for Arbitration and Statement of Claim ("Demand for Arbitration") is pending.

50.     At all times material, SNG engaged in wrongful acts contrary to the express provisions of the MCA.  Specifically, SNG breached Section 2 of the MCA by encumbering the Contributed Assets with liabilities and obligations personal to SNG with no benefit to and to the detriment of the ASPR.

51.     SNG's breach of contract deprived ASPR of its benefit of the bargain and its pecuniary interest in the Contributed Assets.

52.     As a result of SNG's breach, ASPR has suffered actual damages in the amount of $2,800,000.

WHEREFORE, ASPR requests judgment in its favor along with actual, compensatory and consequential damages, pre- and post-judgment interest, and costs along with any other legal or equitable relief the Court deems just and proper.

## COUNT II
### BREACH OF CONTRACT – MEMBER SALE AGREEMENT

53.     ASPR re-alleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

54.     The Member Sale Agreement is a valid and binding contract between ASPR and SNG.

55.     The Member Sale Agreement memorializes the parties' agreement to allocate the sale proceeds between SNG and ASPR according to their respective interests acquired through the MCA.

56.     The Member Sale Agreement includes no carve-outs, set-offs, reductions or any other conditions that reduce ASPR's share of the sale proceeds.

57.     ASPR is entitled to receive no less than $2,800,000 from the sale to Bio-Medical.

58.     SNG breached the Member Sale Agreement by (a) hindering and preventing the payment of ASPR's share of the proceeds directly to it, (b) causing Bio-Medical, instead, to pay the proceeds to accounts at BB&T rendering the proceeds inaccessible to ASPR, and (c) failing to pay to ASPR its 40% share of the $7 Million sale proceeds.

59.     As a result of SNG's breach, ASPR has suffered actual damages in the amount of $2,800,000.

WHEREFORE, ASPR requests judgment in its favor along with actual, compensatory and consequential damages, pre- and post-judgment interest, and costs along with any other legal or equitable relief the Court deems just and proper.

## COUNT III
## DECLARATORY JUDGMENT

60.     ASPR re-alleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 59 as if fully set forth herein.

61.     This is an action for declaratory relief pursuant to 28 USC § 2201.

62.     Section 5(e) of the MCA sets forth a choice of law and venue clause requiring resolution of any action arising under the MCA through "a court of competent jurisdiction in Fort Worth, Texas."

63.     The Member Sale Agreement does not include a choice of law, venue or dispute resolution clause.

64.     The claims raised in this action, particularly those concerning the acts and omissions of SNG at the time of providing the Contributed Assets and acquiring its equity interest in Naranjito, are all claims arising under the MCA to be resolved through this litigation.

65.     Similarly, the dispute regarding the allocation of the sale proceeds directly relates to the parties' obligations arising under the Member Sale Agreement, and properly resolved through this litigation.

66.     SNG, on the other hand, commenced arbitration pursuant to the Operating Agreement[13] seeking, among other things, that the panel declare:

    a.   that SNG's actions were proper with respect to the sale of Naranjito's assets to Bio-Medical and receipt of the sale proceeds; and

    b.   how the sale proceeds are to be disbursed inclusive of set-offs SNG claims.

See Ex. G at 3-4.

67.     The claims identified in paragraph 68 directly arise under the MCA and Member Sale Agreement and, thus, are not subject to arbitration.

68.     There is an actual and justifiable controversy regarding these issues.  The parties are in doubt about their rights and liabilities under their contracts.  Specifically, ASPR seeks a declaration as to the rights of the parties under the MCA and Member Sale Agreement and, particularly, that the claims raised herein are subject to resolution by this Court and not the arbitration panel.

69.     All parties that claim an interest or would be affected by the declaration are joined as parties in this action, and a declaration will not prejudice the rights of any non-party.

70.     Pursuant to 28 USC § 2202, in granting the relief requested, the Court may grant supplemental relief whenever necessary and proper to enforce and effectuate any declaratory relief granted.

_____

[13] Section 12.12 of the Operating Agreement provides for arbitration of certain disputes between the parties to that agreement, assuming certain preliminary conditions were met.

WHEREFORE, ASPR requests a declaration as follows:

a.   Counts I and II are properly before the Court and not subject to arbitration;

b.   SNG shall not prosecute in the pending arbitration the claims raised in Counts I and II;

c.   To the extent the issues raised in Counts I and II are already presented through the Demand for Arbitration, those issues and/or claims shall be stayed from further action in the arbitration; and

d.   Award costs to ASPR.

Dated:  March 16, 2017

Respectfully submitted,

/s/ Carlos F. Concepción
Carlos F. Concepción (*pro hac vice* forthcoming)
Texas Bar No.  24044237
Adrian Nuñez (*pro hac vice* forthcoming)
JONES DAY
600 Brickell Avenue
Brickell World Plaza
Suite 3300
Miami, FL 33131
Telephone: 305.714.9700
Facsimile:  305.714.9799
E-mail:  cconcepcion@jonesday.com
E-mail:  anunez@jonesday.com

***Counsel for Plaintiff Ambulatory Services of Puerto Rico, LLC***

15